OPINION OF THE COURT
Edward J. Greenfield, J.
Can seduction be the basis for a "pattern of racketeering” *566 on which a RICO action for treble damages can be bottomed? Can an attorney, who is denominated "an authority figure”, be guilty of rape of a client by "transference”, and be held liable for battery? Does a claim of malpractice against an attorney exist giving rise to damages for "callously terminating his romantic and sexual relationship with plaintiff”, causing his ex-lover’s depression, mental anguish, and substance abuse? These questions, among others, are raised by the complaint of plaintiff, a woman scorned, whose fury is exemplified in the 13 causes of action she asserts against her ex-attorney and lover, seeking monetary damages and equitable relief. Defendant, charging her action is solely an attempt to extort a settlement, moves for dismissal of the complaint.
THE COMPLAINT
The complaint alleges that defendant, as an attorney, represented plaintiff in her divorce case in 1977. Some time after the divorce case was concluded, plaintiff alleges that defendant, aware of her financial circumstances, embarked on a scheme to exploit her vulnerable emotional state so as to enhance his own standard of living, and that as part of that plan, he began an intimate relationship with her in 1979. Allegedly he told her he wanted to marry her. Plaintiff alleges that because of her "transference response” to defendant, i.e., reacting emotionally to a powerful, benevolent and authoritative figure who had been her attorney, she was unable to resist defendant’s maneuvers.
Plaintiff then moved into defendant’s apartment on the East Side of Manhattan and in February 1980 they jointly purchased a house in the Hamptons, with plaintiff giving up her own apartment, but paying half the expenses for defendant’s apartment. He prepared a new will for her, which named him as executor and a beneficiary. In September 1981, defendant terminated the relationship and demanded plaintiff move out of his apartment. Nevertheless, they have continued to share the house in the Hamptons by splitting expenses and using it on alternate weekends.
Although the relationship which is the underlying basis of the complaint was terminated in September 1981, it was not until 1990, nine years later, that plaintiff commenced this action.
LAWYERS AS LOVERS
While the complaint sets forth 13 separate causes of action, *567 the allegations thereunder and the relief sought overlap to a considerable degree. There are claims of fraud, malpractice, battery and rape, unjust enrichment, constructive trust and infliction of emotional distress, but there is a common thread running through all of these causes of action. Plaintiff alleges that because defendant was an attorney and had previously represented her in a divorce case, when they began an affair thereafter he somehow breached his obligations to her in the attorney-client relationship, taking advantage of his superior legal knowledge and failing to make essential disclosures to protect her rights.
The various cases cited by plaintiff to support the proposition that because defendant was an attorney before he became her lover, he had breached his professional and ethical obligations, will not withstand legal scrutiny. While the complaint, in its 92 paragraphs of allegations, leaves many of the facts and circumstances far from clear, plaintiff has submitted additional affidavits to flesh out the facts and defendant has also interposed factual affidavits together with contemporaneous documents. CPLR 3211 (c) permits either party to submit evidence on the motion, and the court may consider unpleaded facts set forth in the papers to determine whether on a motion to dismiss there should be permission to replead.
The facts thus established clearly show that defendant had represented plaintiff in her divorce action in 1977. It was not until well after that representation had terminated, and after the divorce had been finalized, that plaintiff and defendant began a romantic and intimate relationship in August of 1979. Plaintiff moved into defendant’s apartment in September of 1979, and in October they agreed to purchase a summer home which they would share in the Village of Quogue in Southhampton Township. At the time, the parties were living together in New York City and contemplating marriage. Plaintiff now alleges that in reality defendant had "embarked upon a scheme and course of conduct designed to exploit plaintiff’s vulnerable emotional state”, and that it was the plan of defendant attorney "to use plaintiff’s feelings of emotional frailty and love for him and her substantial financial resources” to gain for himself sexual and economic benefits.
Plaintiff charges that defendant violated Code of Professional Responsibility DR 1-102 (A) (4) (22 NYCRR 1200.3 [4]) by engaging in conduct involving dishonesty, fraud, deceit or misrepresentation; that he violated DR 5-104 (A) (22 NYCRR 1200.23 [a]) by accepting employment from plaintiff in conflict *568 with his own personal interests and by failing to advise plaintiff that she should secure disinterested advice from someone independent. She charges further that he violated DR 5-104 (A) by entering into a business transaction with her as a client where they had differing interests.
As authority, plaintiff cites the disciplinary case of Matter of Bowen (150 AD2d 905), in which a divorce attorney was suspended for two years for having made improper sexual advances to eight women who had consulted him with respect to matrimonial problems. He was also charged with counseling clients to disregard court orders and with furnishing false documents to the court. Such an ongoing course of conduct by an attorney, vis-á-vis numbers of clients of the opposite sex, has no applicability here. Certainly, attorneys are to be held to high ethical and moral standards. There is nothing, however, which would bar an attorney from pursuing a romantic relationship with someone he or she met at an earlier time while acting as counsel. Although some may doubt, attorneys are human beings, and they may seek and pursue relationships with persons they have met on vacation, at social affairs, or even in the office. The conduct which may be proscribed is entering into a sexual relationship with a current client, where emotional involvement may cloud objective professional judgment, and commencing a sexual relationship with a client he represents who is wholly dependant on him and in a very vulnerable state. That could then be considered an abuse of his position. Once an attorney-client relationship is ended, however, an attorney is certainly free to occupy the position of friend or lover.
It is not "the sexual relationship per se which constitute^] a breach of professional responsibility but rather the attorney’s attempt to exploit the professional relationship to gain unsolicited sexual favors.” (Edwards v Edwards, 165 AD2d 362, 367.) As the Appellate Division, First Department, in setting aside a finding that an attorney had breached his professional responsibility by allegedly having a sexual relationship with a client while representing her in a divorce case, there noted, "at the present time, no jurisdiction in the United States has adopted an ethical code [of professional responsibility] expressly proscribing sexual involvement between a lawyer and a client, whether the representation involves a matrimonial matter or otherwise.” (Supra, at 368.)
A lawyer, like any other person, may in his private life be a cad or a king, an inconstant lover or a rock of stability, *569 gracious or a grouch, but in his professional life he may not overstep the bounds and abuse his position of trust as counsel, confidant, champion and fiduciary.
Cases cited by plaintiffs such as Matter of Rudner v Board of Regents (105 AD2d 555), Roy v Hartogs (85 Misc 2d 891), Public Serv. Mut. Ins. Co. v Goldfarb (53 NY2d 392), and Noto v St. Vincent’s Hosp. (142 Misc 2d 292) deal with the impropriety of a sexual relationship between a psychiatrist or other medical person with a patient undergoing therapy. That is a departure from accepted medical standards. Liability for medical malpractice cannot be equated with what occurred here.
When plaintiff and defendant became lovers, it was natural that they would want to share an apartment and that they would want to share a summer house. It was also understandable, since defendant was an attorney, that he would handle the negotiations to purchase the house and to arrange for a mortgage loan. That was not a professional engagement, and of course no fee was charged. "As a matter of human experience personal services will frequently be rendered [between] two people * * * because they value each other’s company or because they find it a convenient or rewarding thing to do.” (Morone v Morone, 50 NY2d 481, 488.) "[Personal services between unmarried persons living together or unmarried persons whose actions flow out of mutual friendship and reciprocal regard * * * are ordinarily done by one person for another as a matter of regard and affection” (Trimmer v Van Bomel, 107 Misc 2d 201, 206).
The parties here were joined as a couple in a partnership of sorts and in a joint venture for the purchase of real estate. Defendant was supplying his legal expertise while plaintiff was pledging her assets as collateral for a bank loan. Both parties were to share the mortgage payments and operating expenses. Plaintiff was a sophisticated business woman who certainly was able to understand that she and the defendant were jointly incurring liabilities for the repayment of the borrowed sums, and were going to own the house jointly.
There is no allegation that defendant failed to pay his share of repayments to the bank and operating expenses, and plaintiff’s collateral has never been called on.
The relationship having terminated, plaintiff now, years after the event, claims in retrospect that the whole affair was a scheme by the defendant from the inception to take advantage of her vulnerable position, with defendant acting as her *570 attorney and allegedly concealing from her the facts about the financing of the house and their joint title. The complaint, however, in each cause of action where abuse of the attorney-client relationship is alleged, has failed to specify any fraudulent concealment or misrepresentation, or to spell out any undue advantage that was taken. The facts of the financing and the joint title were open and notorious. There was no furtive attempt at concealment. The will he executed for her was revocable with the change of circumstances. There is nothing to support the notion that defendant abused his dual position as lawyer and lover, and reaped benefits for himself by cheating the plaintiff.
OWNERSHIP OF THE HOUSE
Five of the plaintiff’s causes of action relate to her attempt to oust defendant from a share of ownership of the house they purchased in 1980. (The causes of action for voiding defendant’s interest, for rescission and for unjust enrichment are dismissed.)
There is no presumption that a transaction involving a lawyer and a lay person is ipso facto invalid. If the transaction has been open and fair, it will stand unchallenged. (Howard v Murray, 38 NY2d 695.) Here, apart from conclusory allegations, there is no showing of overreaching or the taking of undue advantage by defendant.
The sixth cause of action requests a partition and sale. Defendant has no legal objection to this cause of action, and it appears that partition and sale pursuant to RPAPL article 9 should proceed, in order to cut the Gordian Knot and disentangle the parties from their unhappy joint occupancy of the premises.
PERSONAL INJURY AND MENTAL HARM
Plaintiff also claims that defendant’s actions have caused her severe personal injuries, anguish, pain and mental harm. The second cause of action not only seeks rescission, but also requests money damages because, she alleges as a result of defendant’s "fraud” in not disclosing the joint tenancy and her pledge of collateral, that she was caused to suffer from major depression, mental anguish, incapacity to attend to her vocation, loss of her ability to enjoy life and that she became a substance abuser. Apart from the lack of merit in the allegations of fraud and concealment, plaintiff misperceives her *571 remedies. It is well established that damages in a cause of action for fraud are limited to sums of money which are lost as a result of the fraud.
In Hanlon v MacFadden Publs. (302 NY 502, 511), the Court of Appeals declared that in an action for fraud or deceit, the measure of damages for a plaintiff would be "indemnity for the actual pecuniary loss sustained as a direct result of the wrong.” One injured by the commission of a fraud is entitled to recover such damages as would place him in the same position he would have occupied had he not been defrauded. (Hotaling v Leach & Co., 247 NY 84.) Plaintiff here has no "out of pocket” loss. The existence of a joint tenancy rather than a tenancy in common has cost her nothing and her pledged collateral has never been foreclosed. Fraud without damage gives rise to no cause of action. (Matthews v Schusheim, 42 AD2d 217, affd 35 NY2d 686.) Clearly then, a claim for nonpecuniary loss such as the emotional consequences alleged by plaintiff cannot legally be asserted. (Rivera v Wyckoff Hgts. Hosp., 184 AD2d 558, 561.) There is no case which permits a recovery for mental anguish and depression because a fraud was allegedly practiced upon her. For this, and other reasons, the second cause of action is improper.
The same considerations apply to the seventh cause of action charging defendant with legal malpractice. Plaintiff alleges that "defendant’s legal representation of plaintiff was performed in a negligent, unskilled or careless manner and constitutes professional malpractice which resulted in severe personal and psychological injury to plaintiff.” This cause of action is defective in all its aspects. First, it is not established that defendant, after the termination of the divorce litigation, undertook "legal representation” of plaintiff in connection with the purchase of the house and the bank loan. He was not retained professionally, but purportedly acted on a pro se basis for himself and his lover. When two people are living together and contemplating marriage, and one of them is an attorney, that does not necessarily mean that any actions he takes in negotiations for the benefit of both is on an attorney-client basis.
Second, there is nothing to substantiate the conclusory charge that he acted in a "negligent, unskilled and careless manner.” It is not really lack of professional skill, but the fact that the lover who broke up with her happened to be a lawyer which is the underlying theme of the malpractice claim. That, of course, has nothing whatever to do with the defendant’s *572 lawyerly skills or lack thereof. Deficiencies as a lover are not to be equated with deficiencies as a lawyer.
Third, damages for malpractice are also limited to pecuniary loss — i.e., the difference between the actual result achieved and that which should have been accomplished, and the financial loss thereby sustained. Plaintiff alleges no such loss. Her only claim is for the mental anguish and psychological suffering caused by defendant’s actions, and this certainly is not recoverable in the guise of a malpractice claim. In a legal malpractice action, "[w]here the injury suffered is the loss of a cause of action, the measure of damages is generally the value of the claim lost.” (Campagnola v Mulholland, Minion & Roe, 76 NY2d 38, 42.) There appear to be hardly any reported cases in New York dealing with mental anguish and psychological suffering as an element of damages in a case for legal malpractice, for few attorneys have had the temerity to press such a claim. The only reference to such a claim occurs in the recent case of Walker v Stroh (192 AD2d 775 [3d Dept]), where, in a malpractice action for the alleged mishandling of a sale of stock controlling real estate, the claim for attendant emotional harm was stricken. Similarly, in California, where attorneys were charged with malpractice in connection with an action to quiet title, the plaintiff’s claim for emotional distress arising from alleged malpractice was dismissed. (Quezada v Hart, 67 Cal App 3d 754.) A claim for emotional distress arising out of alleged malpractice by an attorney in a custody case was also dismissed in Segall v Berkson (139 Ill App 3d 325). Understandably, everyone who engages an attorney and is disappointed in the results experiences some degree of concern, distress and frustration. Like grief, there is no way that the distress arising from a lost case or a mishandled matter can be measured or compensated for.
Causes of action 10 and 11, which charge respectively malicious and negligent infliction of emotional distress, with the exception of the words "maliciously” and "negligently” are mirror images of one another. The essence of a cause of action for emotional distress is that the defendant must have engaged in conduct " 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community’.” (Fischer v Maloney, 43 NY2d 553, 557.) The assertion of a cause of action for infliction of emotional distress will not be permitted as a substitute for evading traditional tort or contract doctrines. (Murphy v *573 American Home Prods., 58 NY2d 293, 303.) Conduct which distresses another party is not actionable if it is within societal norms.
New York has not permitted the assertion of a cause of action for infliction of emotional distress in cases arising from marital disputes. (Weicker v Weicker, 22 NY2d 8; Eller v Eller, 136 AD2d 678.) In the recent case of Jose F. v Pat M. (154 Misc 2d 883, 885), a case in which a man cohabiting with a woman alleged two causes of action against her — fraud and intentional infliction of emotional distress — the court dismissed the complaint as legally insufficient, observing that allowance of an action for infliction of emotional distress predicated on events in a marital context would subvert legislative intent in enacting Civil Rights Law § 80-a. As indicated in the Weicker case (supra), the same public policy considerations should prevail where the parties were never married but had lived together. The Appellate Division, Second Department, has declared, "it would be contrary to public policy to recognize the existence of this type of tort in the context of disputes, as here, arising out of the differences which occur between persons who, although not married, have been living together as husband and wife for an extended period of time.” (Baron v Jeffer, 98 AD2d 810, 811; to the same effect, see also, Artache v Goldin, 133 AD2d 596, 600.) As the court declared in Jose F. v Pat M. (supra, at 885), "[i]t is inappropriate for the court to intrude into an intimate relationship in an attempt to substantiate what is tantamount to an action for seduction.”
The outrageous conduct which is alleged here consists of defendant having "callously entered into and terminated his romantic and sexual relationship with plaintiff upon securing the financial benefits he desired.” This certainly has the earmarks of the earlier actions for seduction or breach of promise to marry, i.e., entering into and breaking off a sexual relationship by means of allegedly false promises. The public policy of this State now looks with disfavor upon actions for seduction and the statute permitting it was repealed many years ago. (L 1935, ch 263, now Civil Rights Law § 80-a; see, People v Evans, 85 Misc 2d 1088, 1095-1096, affd 55 AD2d 858.) Certainly, New York courts will not recognize termination of a romantic and sexual relationship as the basis for a cause of action for emotional distress.
The other allegations that defendant misused his professional relationship to derive financial benefits for himself and *574 the details as to the purchase of the house and the handling of the bank loans under no circumstances rise to the necessary level of "outrageous conduct.” Nor are further allegations that defendant asked for an excessive price as a condition for a buyout and that he berated plaintiff for removing furniture from the house actionable as extreme and outrageous conduct. She also charges that the use of the house by the defendant and his family "represented a constant and painful reminder to plaintiff of defendant’s rejection to her.” Further charges by plaintiff that defendant, after he married another person and had a child, "permitted his baby’s furnishings to remain scattered about the house and lawn” which they used on alternative weekends, despite his knowledge that that would cause distress to plaintiff, while conceivably distressing to a sensitive person, also fall into the category of fall-out from heartbreak.
THE RICO CLAIM
Plaintiff’s third cause of action alleged that defendant in carrying out his fraudulent scheme, used the mail and wires in connection with the acquisition of the house and the obtaining of the bank loans. It is alleged that each employment of the wire and mails constituted criminal mail and wire fraud, and that since defendant was associated with other attorneys in law firms, he was engaged in an ongoing "enterprise” as part of his scheme to defraud, and that this constituted a "pattern of racketeering activity” pursuant to 18 USC § 1961 et seq. entitling plaintiff to recover treble damages and attorneys’ fees.
The essence of a civil RICO claim is the commission of two or more acts constituting a pattern of racketeering activity by a participant in an enterprise which affects interstate of foreign commerce. (Moss v Morgan Stanley, 719 F2d 5, cert denied sub nom. Moss v Newman, 465 US 1025.) A single criminal episode, regardless of how many fraudulent acts it entails, does not constitute "an enterprise.” (Simpson Elec. Corp. v Leucadia, Inc., 72 NY2d 450, citing Beauford v Helmsley, 843 F2d 103, 110.) In the absence of an allegation that persons other than defendants were defrauded in a like manner, no pattern is set forth. (Simpson Elec. Corp. v Leucadia, Inc., supra, at 464.)
Plaintiff contends that the pattern of racketeering activity was made out by allegations that she was induced to obtain *575 two separate loans, each of which involved mail or wire fraud. The "ongoing enterprise” is alleged to be the existence of the law firm defendant was associated with, even though it is clear that the law firm received no fees for this essentially private and personal transaction. The initial Beauford decision (supra) was overruled en banc (Beauford v Helmsley, 865 F2d 1386). But Simpson (supra) still stands as controlling New York law. While in Beauford, there was one scheme directed at buyers of 8,000 condominium units, here we have a single individual involved in virtually contemporaneous transactions focused on a single real estate purchase. A court should not permit a plaintiff to convert what was essentially a single transaction into micro-units of activity in an attempt to demonstrate a multiplicity of acts.
The effort to twist and torture the factual pattern of this case to create a proximate resemblance to a RICO case is unavailing, as tempting as the prospect of treble damages and attorneys’ fees may be. The decision of plaintiff and defendant to live together and share a house, and to be equally responsible for all expenses, hardly qualifies as a "pattern of racketeering activity.”
RAPE AND BATTERY
The eighth and ninth causes of action allege that at "the time defendant had sexual relations with plaintiff, he knew or should have known that plaintiff was emotionally vulnerable and that her feelings of attachment to him were actually a 'transference’ response stemming from his representation of her in connection with her divorce”, as a result of which "she was unable to resist defendant’s sexual advances or to give free or informed consent to such sexual advances”, and that he therefore committed battery and rape. Battery is the intentional and willful physical contact with a person without his or her consent. Rape is the use of physical force or threats of forcible compulsion overcoming objections, or sex with a person who is incapable of consent. (Penal Law §§ 130.25, 130.35.)
It is clear that initially plaintiff entered into a sexual liaison with defendant which continued for almost two years before they broke up. After her rejection, plaintiff now charges that she had really been unable to resist because of a "transference response.” "Transference” is the psychological phenomenon which arises when a person in therapy transfers *576 all her romantic feelings to the authority figure who is treating her. Plaintiff attempts to analogize this psychiatric response to the attorney-client relationship. She claims that because plaintiff appeared to her to be an authoritative figure, and a person of wisdom and benevolence, that she was overwhelmed in his presence and therefore incapable of any resistance to him. This court is unwilling to entertain the theory that if someone has an ongoing affair with one who had previously dealt with her in a professional capacity and was perceived by her as paternal, authoritative, wise, kind and benevolent, that the romantic feelings kindled by such a personality would make her incapable of acting as a consenting adult. Ms. Sanders was 31 years old in 1979 and as appears from the affidavits she submitted in support of her complaint, her previous five-year marriage had been terminated, with the defendant representing her in those proceedings. In August 1979, she once again met defendant who was vacationing in the Hamptons, and they began a social relationship. She stated to her psychiatrist: "I trusted him. I absolutely trusted him. He was a serious person and he had been my lawyer. He was very level headed.” Her choosing to have an affair with someone she regarded as trustworthy and level headed, which affair continued for almost two years, can hardly be classified as battery or rape.
Plaintiff has apparently attempted to fit her case within the pattern of Coopersmith v Gold (172 AD2d 982). There, defendant, a psychiatrist, was charged with malpractice, fraud and battery after the termination of an affair of several months. There, too, plaintiff claimed "transference” during the course of her therapy, stating that she had experienced overwhelming romantic feelings toward defendant. The Appellate Division, Third Department, reversed the trial court and dismissed the causes of action for fraud and battery, concluding that in essence the cause of action was really for seduction.
Accordingly, this court rejects the legal theory that because one person finds another overwhelmingly attractive, charismatic, powerful, perceptive and caring, causing intense feelings of romantic love, that that is the equivalent of a deprivation of power to act as a consenting adult. Plaintiff here says she saw the defendant as "God-like, all knowing and powerful”, and when rejected she felt helpless. Such intense feelings, no matter what the aftermath, cannot be retroactively transmuted into claims of battery and rape.
*577 STATUTE OF LIMITATIONS
Plaintiff alleges that the defendant embarked on his "scheme and course of conduct to exploit plaintiff’s feelings of emotional frailty” for personal gain in August of 1979. The loans for the house were negotiated in 1979. Closing of title took place in February 1980. In September 1981, the relationship between plaintiff and defendant was terminated. This action was commenced by service in June of 1990. (Nine years having elapsed since the breakup, the court finds all the contested causes of action are barred by the Statute of Limitations.)
Plaintiff attempts to avoid the application of the Statute of Limitations by claiming that the limitations period did not run subsequent to the breakup in September 1981 because the breakup put her in a profound state of depression and rendered her apathetic and dysfunctional. CPLR 208, which provides for tolling, specifies that the limitations period is extended if the "person entitled to commence an action is under a disability because of infancy or insanity at the time the cause of action accrues.” What the statute clearly contemplates is a disability which prevents a plaintiff from recognizing a legal wrong and from engaging an attorney to rectify it. There is no allegation that plaintiff was under a disability at the time of the alleged fraud, malpractice and rape. The Court of Appeals had made it quite plain that apathy, depression and neurosis are not so disabling as to toll the Statute of Limitations. It pointed out that when the CPLR was enacted, the possibility of using the phrase "mental illness” was rejected and therefore tolling should be limited "only to those individuals who are unable to protect their legal rights because of an over-all inability to function in society.” (McCarthy v Volkswagen of Am., 55 NY2d 543, 548.) While plaintiff has portrayed herself as helpless, she was able during this period to function in a job.
Furthermore, plaintiff’s claim of total disability is refuted by the documented fact that she told an attorney friend of the facts and had him intercede on her behalf in 1985, but it was not until 1990 that she found an attorney willing to press the varied causes of action asserted here.
Defendant is not estopped from claiming the defense of Statute of Limitations, since it does not appear that there was any cover-up or concealment as to what he had done. It does not appear that plaintiff was lulled into inactivity by actions *578 on the defendant’s part after the termination of their relationship. An estoppel can arise only from fraud, concealment or coercion which prevents the plaintiff from timely action. (Simcuski v Saeli, 44 NY2d 442; cf., Gallas v Greek Orthodox Archdiocese, 154 Misc 2d 494, 502.)
CONCLUSION
For the reasons above stated, all causes of action alleged by plaintiff with the exception of causes of action six, twelve and thirteen, are dismissed for legal inadequacy and are time barred. The essence of these causes of action is that plaintiff was taken advantage of by an unscrupulous lawyer-lover to whom she gave her trust and affection and who rejected her. Courts can deal appropriately with broken contracts and broken legs. It cannot give remedy for unrequited love and broken hearts.